## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 04 2019, 7:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

A.B. and D.B. (Minor Children)

and

J.L. (Mother)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

September 4, 2019

Court of Appeals Case No.
19A-JT-641

Appeal from the Vigo Circuit Court

The Honorable Sarah K. Mullican, Judge

The Honorable Daniel W. Kelly, Magistrate

Trial Court Cause Nos.
84C01-1805-JT-626, 84C01-1805-JT-627

**Altice, Judge.**

## Case Summary

[1] J.L. (Mother) appeals following the termination of her parental rights to A.B. and D.B., Jr. (collectively, the Children). On appeal, Mother argues that the evidence is insufficient to support the court's termination of her parental rights to the Children.

[2] We affirm.

## Facts & Procedural History

[3] D.B. (Father)[1] and Mother are the biological parents of A.B., born August 25, 2012, and D.B., Jr., born August 5, 2013.[2] On June 7, 2016, the Department of Child Services (DCS) filed, under separate cause numbers, petitions alleging that the Children were children in need of services (CHINS). At an initial hearing on June 21, 2016, Mother and Father admitted to the allegations in the CHINS petitions as follows:

> a. On or about March 22, 2016, the [DCS] hotline received a report that there was a chemical smell coming from the [family's] trailer . . ., and that it burned your nose to smell it and that there were two young children in the home;

---

[1] The court also terminated Father's parental rights to the Children. Father, however, does not participate in this appeal. We thus set forth the facts only as they relate to Mother.

[2] Mother has an older child who has been adopted by Mother's mother (Maternal Grandmother). In September 2017, while the CHINS case was pending, Mother gave birth to a fourth child.

b. [Family Case Manager (FCM)] Gonthier went to the home on March 25, 2016, and observed the home to be very cluttered, dirty dishes and trash throughout the home, there was very little food in the home;

c. Mother advised FCM that she was out of food stamps and would not receive next month[']s until April 5, 2016;

d. [Mother] advised FCM that [Maternal Grandmother] would be bringing her food later in day [sic];

e. FCM asked [M]other to drug screen and she immediately began crying and stated that she had used methamphetamine the day before;

f. Mother's drug screen from March 25, 2016 was positive for methamphetamine;

g. [Maternal Grandmother] came to the home with food;

h. The [M]aternal [G]randmother . . . agreed to be the sober caregiver and signed a safety plan to do so;

i. That [F]ather refused to drug screen unless there was a Court Order;

j. On April 8, 2016 FCM went to the home and it was messy and clutter[ed] and [M]other advised FCM that they were being evicted.

k. [Mother] showed FCM a hole punched in the wall that she stated she had done and that she needed help with anger management.

l. That both parents repeatedly told FCM that everything was fine and they didn't need services;

m. The family was evicted and now are living with [Mother's] grandmother, the [C]hildren's great grandmother.

n. Due to [the] high risk associated with methamphetamine use, the young age of the [C]hildren, the condition of the home, lack of food, and [M]other's self-disclosure of anger issues the DCS believes that the [C]hildren are in imminent risk of abuse and neglect and that the coercive intervention of the Court is necessary to ensure that services are in place and followed by the family.

*Exhibits 27-28, 32-33.* The court adjudicated the Children to be CHINS. At that time, however, the Children were not removed from the home.

[4] On August 5, 2016, the court entered its dispositional order, requiring Mother to maintain weekly contact with DCS and service providers, enroll in all programs recommended by DCS and/or service providers, maintain suitable housing, secure employment, not use illegal drugs, complete a substance-abuse assessment and all recommendations, and submit to random drug screens with any screen not completed in a timely manner considered a positive result.

[5] On December 8, 2016, after Mother tested positive for and admitted using methamphetamine, the Children were removed from her care. At that time, DCS also noted a lack of compliance with services, ongoing concerns about a lack of a sober caregiver, and ongoing concerns about the cleanliness of the Children. Following a dispositional modification hearing on December 12,

2016, the court approved of the Children's placement in foster care and ordered Mother to participate in supervised visits.

[6]     Over the course of the next few months, Mother completed the medication evaluation and started medication management services at Hamilton Center for her psychiatric conditions, including bi-polar disorder, ADHD, anxiety, depression, PTSD, and possible split personality disorder. Mother also completed a substance-abuse assessment on April 3, 2017. Mother, however, attended only two or three days of the eight-week group therapy recommended for her substance abuse.

[7]     Beginning in May 2017, Mother secured stable housing and employment and kept in regular contact with FCM Charissa Antrobus as well as service providers. Mother rented a house owned by and across the street from Maternal Grandmother's home. Mother attended her supervised visits and developed a bond with the Children. Mother was also consistent in submitting to drug screens. FCM Antrobus testified that Mother was "very determined and focused" on getting the Children home. *Transcript* at 60. Given Mother's compliance with services, DCS increased the frequency of Mother's visits with the Children. On December 22, 2017, DCS permitted the Children to be returned to Mother's care for a trial home visit.

[8]     In February 2018, Maternal Grandmother reported to DCS that the Children complained of being hungry and that Mother often left the Children in the care of their great-grandmother, who also lived in the house, while Mother slept.

DCS removed the Children from Mother's home on February 27, 2018. According to FCM Antrobus, the "determining factor" for ending the trial home visit was that Mother submitted a positive drug screen.[3] *Id*. at 69. Over the next few months, Mother struggled with substance abuse, was unable to maintain stable housing, and did not visit with the Children. Due to Mother's non-compliance with services, DCS put services "on hold." *Id*. at 54. On June 25, 2018, DCS filed its petition to terminate Mother's parental rights to the Children. A fact-finding hearing was held on September 25, 2018, and January 28, 2019.

[9] At the September fact-finding hearing, Mother admitted she has a substance-abuse problem and that she has struggled with methamphetamine for "two, three years off and on." *Id*. at 15. Mother explained that she started using methamphetamine because she was "working . . . seven days a week, twelve hour shifts plus doing on-line classes and taking care of the two kids by myself basically. Not getting no sleep, going to work half asleep or falling asleep at work." *Id*. Mother claimed she only uses methamphetamine to "stay awake and function." *Id*. at 27. She admitted that "major life events have triggered most of her relapses." *Id*. at 33-34.

[10] Mother also admitted that she had stopped participating in services after the Children were removed in February. She stopped regularly submitting to drug

---

[3] DCS also removed Mother's youngest child, who then was only a few months old, and started CHINS proceedings with respect to that child.

screens, admitting that she missed "too many to count." *Transcript* at 20. Of the drug screens to which Mother did submit, all were positive for methamphetamine. Her last positive screen was eleven days before the September hearing. Mother was charged with possession of methamphetamine on June 4, 2018. Mother had not visited with the Children since they were removed in February. Mother was also evicted from her home and for several months, lived "[h]ere and there. On the streets basically." *Id*. at 13. At the time of the September fact-finding hearing, Mother was not working. She relied on friends to pay her rent and pay for her vehicle.

[11] The court adjourned the September 25 hearing and set an additional hearing date for January 28, 2019. Mother understood that after the September hearing she needed to "aggressively engage in services" if she wanted her Children returned to her care. *Id*. at 108. After the September hearing, Mother was evicted from where she was living because she used methamphetamine. She explained, "I'd rather go out and get high than pay my bills is what it was down to." *Id*. at 102. Mother was on the streets until she went to a domestic violence shelter in Terre Haute. Mother was "asked" to leave that program because she "didn't go to rehab." *Id*. at 144.

[12] In October 2018, Ramona Holland, a court appointed special advocate (CASA) assigned to the Children for purposes of the termination proceedings,[4] initiated

---

[4] CASA Holland was initially appointed in the Clay County CHINS case regarding Mother's youngest child and interacted with Mother and the Children prior to her appointment in these proceedings.

a no-contact order against Mother in October 2018. The no-contact order was in response to Mother's attempts to see the Children while they were at school. According to CASA Holland, Mother also threatened multiple times to murder various individuals associated with the CHINS cases if she did not get the Children back and also threatened to kill herself.

[13] On December 21, 2018, Mother went to Stepping Stones for substance-abuse treatment. Mother refused to stay, however, because, according to Mother, she was "treated like a prisoner" and "just didn't feel comfortable." *Id*. at 104. Mother testified that she did not like the tone of their voices and that they tried to make her throw away her e-cigarette and her phone.

[14] Mother tried to do a substance abuse assessment in December 2018, but the service referral had expired. Mother testified that she planned to schedule a walk-in appointment. Two weeks prior to the January hearing, Mother again started medication management. Maternal Grandmother testified that she did not believe that Mother's medications were helpful and that Mother does not always take her medications.

[15] Mother did not visit the Children until nearly two months after the September hearing. Since their removal in February, Mother visited the Children only six times out of thirty possible visits and appeared impaired during some of the visits. Her last visit with the Children was on December 14, 2018.

[16] FCM Antrobus opined that the reasons for DCS's involvement were not likely to be remedied, noting that the case had been open for nearly three years. She

testified that the Children need stability and need to know where they are going to be for more than a few months. She was of the opinion that returning the Children to Mother's care would be harmful to the Children because of Mother's drug use and inconsistency. FCM Antrobus expressed concern about Mother's inability to maintain sobriety given Mother's admitted relapse triggers. FCM Antrobus acknowledged that Mother was "highly capable of being a decent parent." *Id.* at 73. She explained, however, that "we just go back to the addiction and the issues of substance use and how triggers can easily lead to a relapse and unfortunately in life there's many triggers and there's many things that could lead to relapse and that would be at the expense of [the C]hildren and that definitely concerns me." *Id.*

[17] FCM Alisha Hon took over the case on December 14, 2018. She testified that reunification was not an option because Mother did not have a stable home, the length of time the case had been open, and Mother had just started medication management two weeks before the January hearing date. She also cited concerns with Mother's choice in relationships, noting that she seeks out individuals who can take care of her but "they're not always the best influences." *Id.* at 147. FCM Hon noted that the most recent individual Mother was living with was arrested in October 2018 for possession of methamphetamine.

[18] CASA Holland likewise recommended termination based on Mother's unstable housing, drug use, and threats to kill individuals associated with the case in addition to threats to kill herself. She testified that the Children need

permanency and should not need to wonder "where am I going to be" if Mother "has a meltdown" and "goes back to drugs." *Id.* at 177.

[19] With regard to placement of the Children, after they were removed in February 2018, DCS placed them with Maternal Grandmother. In October 2018, Maternal Grandmother advised DCS that she could no longer care for them. DCS placed the Children in a foster home, where they remain together. DCS's plans for the Children include adoption by a foster family or perhaps a relative placement.

[20] At the January 2019 hearing, Mother testified that she had obtained housing and transportation, had taken steps to address domestic violence in the home and separate herself from bad influences, had enrolled in online college courses, and had been sober since late November 2018. Mother testified that she believes she can successfully complete all required services within two months and requested that she be given the opportunity to do so.

[21] At the conclusion of the hearing, the court took the matter under advisement. On February 7, 2019, the court entered its ordering terminating Mother's parental rights to D.B. On February 11, 2019, the court entered its order terminating Mother's parental rights to A.B. Mother now appeals both orders. Additional facts will be provided as necessary.

## Discussion & Decision

[22] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[23] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[24] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those

of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[25] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by "clear and convincing evidence," among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-37-14-2; Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[26] Mother does not challenge any of the court's findings of fact. Thus, the issue before us is whether the unchallenged findings support the court's judgment. *In re S.S.*, 120 N.E.3d 605, 611 (Ind. Ct. App. 2019) (noting that "because neither

Father nor Mother has challenged these findings on appeal, we must accept these findings as true") (citing *Bester*, 839 N.E.2d at 147).

[27] Mother challenges the court's conclusions as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the court found that DCS presented sufficient evidence to conclude that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside Mother's care will not be remedied and that continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. § 31-35-2-4 (b)(2)(B)(i), (ii). We focus our review on the requirements of subsection (b)(2)(B)(i).

[28] In determining whether there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside Mother's care will not be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id*. In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762

N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[29] Mother argues that the court's conclusion in this regard is clearly erroneous and premature. She asserts that she has shown she is "capable of overcoming her drug abuse" and that she is "well on her way and has indicated her intent to maintain her sobriety and reclaim her children." *Appellant's Brief* at 23, 24. Mother points out that after the September 2018 hearing, she sought medical assistance, started taking her mental health medications, obtained housing and transportation, and attempted to engage in services aimed at addressing her drug addiction. Mother is essentially requesting us to reweigh the evidence, which we will not do. *See D.D.*, 804 N.E.2d at 265.

[30] After the Children were removed in February 2018, Mother put forth minimal effort to participate in services. She admitted that she missed "too many drug screens" to count and that when she did screen, the results were positive. *Transcript* at 20. Mother also admitted that she was essentially homeless, living on the streets for a period of time. Mother also did not visit with the Children.

[31] Mother's situation did not improve much after the September 25 hearing at which she was told she needed to "aggressively engage in services" if she wanted the Children returned to her care. *Id*. at 108. Mother did not visit the Children until November and had not visited with the Children since December

14, 2018. Mother also walked out of a substance-abuse treatment facility because she did not like the rules, relied on friends to pay her rent and for her transportation, and waited until two weeks prior to the January hearing to start participating in medication management for her psychological disorders. Mother had nearly three years to remedy the conditions that led to removal of the Children and their continued placement outside her home. During that time, Mother made poor decisions for herself and the Children, relapsed, and thereafter continued to use methamphetamine, failed to address her mental health issues, failed to complete services, failed to maintain suitable housing, and failed to visit the Children. At the time of the final hearing, Mother had not demonstrated an ability to care for the Children or that she should be afforded more time to engage in services.

[32] Mother's pattern of substance abuse and her minimal effort to engage in services since the Children were removed in February 2018 support the court's conclusion that there is a reasonable probability that the conditions resulting in removal of the Children and their continued placement outside Mother's home will not be remedied.

[33] Mother also argues that the court's conclusion that termination is in the Children's best interests is clearly erroneous. To determine what is in the children's best interests, the court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the court must subordinate the interests of the parents to those of the children. *Id*.

[34] Mother argues that giving her additional time to participate in and complete services is in the Children's best interests. She cites FCM Antrobus's testimony that Mother has the potential to be a good mother. Again, Mother is simply requesting that we reweigh the evidence. Although acknowledging that Mother "is highly capable of being a decent parent," FCM Antrobus opined that the reasons for removal were not likely to be remedied and expressed concern that returning the Children to Mother's care would harm the Children due to Mother's inconsistency and her inability to maintain sobriety. While Mother was able to achieve sobriety, such sobriety was short-lived and was followed by a year of non-compliance with services.

[35] Further, we note that two FCMs and a CASA discussed the Children's need for permanency and stability and testified that termination of Mother's parental rights is in the best interests of the Children. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests"). The trial court's best interest conclusion is not clearly erroneous.

[36] Judgment affirmed.

Brown, J. and Tavitas, J., concur.